Benjamin J. BORGER, a minor, by Darrell
J. BORGER, his father and next friend,
and on behalf of others similarly situat-
ed, Plaintiffs,

v.

Anthony BISCIGLIA, Superintendent of
the Kenosha Unified School District No.
1; Kenosha Unified School District No.
1; and The Board of Education of the
Kenosha Unified School District No. 1,
Defendants.

Civ. A. No. 94–C–927.

United States District Court,
E.D. Wisconsin.

Jan. 4, 1995.

Terry Rose, Rose & Rose, Kenosha, WI, for plaintiffs.

Charles H. Bohl, Kathryn West, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for defendants.

## DECISION AND ORDER

REYNOLDS, District Judge.

On August 18, 1994 sixteen-year-old Benjamin Borger ("Borger") filed this First Amendment civil rights suit (by his father, Darrell Borger), against the Kenosha School District, its superintendent, and its board of education ("School Board") because they refused to allow the movie "Schindler's List" to be shown as part of his high school curriculum. Borger now seeks summary judgment and a declaration that the defendants' decision to prevent the viewing of any R-rated film, including "Schindler's List", as part of the curriculum at his school violated Borger's and other students' rights under the First and Fourteenth Amendments. He also asks for an injunction barring the defendants from enforcing the portion of the School Board's policy prohibiting the instructional use of any film which the Motion Picture Association has rated "R". The School Board and superintendent have filed a cross motion for summary judgment. For the following reasons, the court grants the defendants' summary judgment motion, denies Borger's motions for summary judgment and for preliminary injunction, and dismisses this case.

## FACTS

In early 1994, several United States History teachers at Bradford High School in Kenosha, Wisconsin, asked principal Joseph Mangi to send a memorandum to superintendent Anthony Bisciglia requesting that the school sponsor a viewing of the R-rated film, "Schindler's List," as a supplement to the educational materials available to tenth grade students. (Compl. ¶ 8; Defs.Prop. Findings of Fact ¶ 13.) On February 11, 1994, Principal Mangi sent that letter, requesting that the teachers be allowed to take the students to a local theater to view the film during a school day.[1] (Compl. ¶ 8; Defs. Prop. Find-

ings of Fact ¶ 14.) Superintendent Bisciglia rejected the request for the singular reason that "Schindler's List" has been rated "R" by the Motion Picture Association of America ("MPAA"), and was therefore banned from the curriculum by the Kenosha School District policy (section 6161.11) on the selection of instructional materials, which limits the use of rated commercial films in the classroom to those rated PG–13, PG, and G. (Compl. ¶ 8; Defs.Prop. Findings of Fact ¶ 15.)

The School Board created policy 6161.11 in 1976 and has revised it twice since then—in 1981 and 1991. The current version of policy 6161.11 states:

Commercial entertainment films having obvious educational value may be included when appropriate to the subject being studied.

Commercial films that are unrated or rated PG or PG–13 shall not be shown to students in the District without advance written notice to the parents. Such notice shall contain an accurate description of the contents of the film.

*No films having a rating of R, N17, or X shall be shown to students at any school.*

(Bisciglia Aff., Ex. C., emphasis added.)

Thus, when determining which films may be shown in school, the School District relies on the ratings established by the voluntary movie rating system of the Motion Picture Association of America ("MPAA"). The MPAA's full-time rating board in Los Angeles decides the ratings by majority vote. (Price Aff., Ex. A. at 5–6.) According to a 1994 document put out by the MPAA and written by Jack Valenti, President and Chief Executive Officer of the MPAA, the rating board looks to the "theme, violence, language, nudity, sensuality, drug abuse, and other elements" to determine what rating to give a film. (*Id.* at 4.)

The MPAA rating board gave "Schindler's List" an R-rating. (Price Aff., Ex. B.) According to the MPAA literature, an R-rating means that the movie is "restricted," and

---

1. At the time, the movie was not available on video.

that children under 17 require an "accompanying parent or adult guardian." (Price Aff., Ex. A.) The literature explains, that when the rating board gives an R rating:

> In the opinion of the Rating Board, this film definitely contains some adult material. Parents are strongly urged to find out more about this film before they allow their children to accompany them.

> An R-rated film may include hard language, or tough violence, or nudity within sensual scenes, or drug abuse or other elements, or a combination of some of the above, so that parents are counseled, in advance, to take this advisory rating very seriously. Parents must find out more about an R-rated movie before they allow their teenagers to view it.

(*Id.* at 9.) The rating board gave "Schindler's List" an "R" rating "for language, some sexuality and actuality violence." (Price Aff., Ex. B.)

Ben Borger attends Bradford High School and was a tenth-grader in February of 1994. Although they were not allowed to show "Schindler's List", the teachers in the 1993/94 tenth grade United States History classes at Bradford found many creative ways (including the use of other films) to teach about the Holocaust. (Defs.Prop. Findings of Fact ¶¶ 16–20.) Nonetheless, on February 22, 1994, Borger circulated a petition among the students which stated:

> We, the undersigned, students of Bradford High School ask for the Board to reconsider the decision against seeing the film Schindler's List.

(Compl. ¶ 8 & Ex. A; Defs.Prop. Findings of Fact ¶ 21.) Borger obtained over 400 signatures attached to this petition, which he took with him to present to the School Board meeting that very night. (Compl. ¶ 8 and Ex. attached thereto; Defs.Prop. Findings of Fact ¶¶ 22–23.) The School Board refused to take action on the issue, and so Borger filed this case. (*Id.* ¶ 24.)

Borger is now in the eleventh grade, and wants the School Board to allow the Government class teachers to show "Schindler's List".

## ANALYSIS

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, no material facts are in dispute, and the court finds that the law does not support Borger's First Amendment claim.

 Students do not lose their First Amendment rights when they walk through the schoolhouse door. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). However, courts have decided that the scope of the First Amendment within the classroom must be tempered, and that the content of the curriculum is within the sound discretion of school officials, with exceptions in rare cases. So strong is this concept, that the U.S. Court of Appeals for the Seventh Circuit has proclaimed that high school students contesting the curriculum decisions of local authorities must raise issues which "cross a relatively high threshold before entering upon the field of a constitutional claim suitable for federal court litigation." *Zykan v. Warsaw Community Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir.1980) (high school administration's removal of certain books from English course and school library upheld against students' challenge). Courts should not interfere with local educational discretion unless "local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute." *Id.* Only a "flagrant abuse of discretion" merits judicial intervention. *Id.*

 Thus, school officials have abundant discretion to construct curriculum, and they only violate the First Amendment when they limit access to materials "for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials disapproval of the ideas involved." *Board of Ed. v. Pico*, 457 U.S. 853, 879–80, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982)

(Blackmun, J. concurring).[2] Thus, the court must consider whether or not the defendants' decision bore a reasonable relationship to a legitimate pedagogical concern. *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988) (school officials' editorial actions must be "reasonably related to legitimate pedagogical concerns.... It is only when the decision to censor a ... vehicle of student expression has no valid educational purpose that the First Amendment is so 'directly and sharply implicate[d]' as to require judicial intervention to protect students' constitutional rights"); *Krizek v. Board of Ed.,* 713 F.Supp. 1131, 1139 (N.D.Ill.1989) (*Hazelwood* "reasonable relationship" test should be applied to challenges against school administration curriculum restrictions); *Virgil v. School Bd.,* 677 F.Supp. 1547, 1551 (M.D.Fla.1988) *aff'd* 862 F.2d 1517 (11th Cir.1989) (same).

■ This is not a case in which the plaintiff alleges that school officials acted pursuant to political or religious beliefs. The undisputed facts establish that the superintendent and School Board decided not to allow "Schindler's List" to be shown solely because it was R-rated and banned by policy 6161.11.[3] The defendants have presented an unrebutted "legitimate pedagogical concern"—that its students not be subjected to movies with too much violence, nudity, or "hard" language. This is a viewpoint-neutral, non-ideological reason for a facially neutral policy and a viewpoint-neutral application of that policy. Borger does not dispute that the school has a legitimate policy to try to keep harsh language, violence, and nudity out of the history or government classroom curriculum.

Nor is this a case in which a student asks that the court force the school to add a film to the curriculum. Such a case would doubtlessly fail under *Pico,* 457 U.S. at 871, 102 S.Ct. at 2810, in which Justice Brennan's plurality opinion doubted that students would be able to force the School Board to *add* new school materials even though they might be able to stop the School Board from *eliminating* materials already at school. *Id.*

Instead, this case is about whether the defendants can rely on the MPAA rating system, instead of upon their own viewing of the film, in order to exclude it from the curriculum due to language, violence, and nudity. In other words, Borger argues that the use of the MPAA ratings system is not reasonably related to the School Board's admittedly legitimate concern. The court disagrees.

■ It is true that a private organization's rating system cannot be used to determine whether a movie receives constitutional protection. For instance, a city cannot rely on the rating system to determine which movies are "obscene speech" and thereby less protected. *See e.g., Engdahl v. Kenosha,* 317 F.Supp. 1133 (E.D.Wis.1970); *Motion Picture Ass'n v. Specter,* 315 F.Supp. 824 (E.D.Pa.1970). Neither this court nor the School Board is bound by the R-rating that "Schindler's List" received.[4]

However, that does not mean that the School Board cannot choose to use the ratings system as a filter of films. As noted above, the Supreme Court has said that schools and classrooms are non-public forums, outside the general marketplace of expression, and school boards have more discretion to censor within that environment than do bodies governing the public sphere. *Hazelwood,* 484 U.S. 260, 108 S.Ct. 562 (school newspaper part of curriculum and therefore non-public forum, subject to censorship which is reasonably related to legitimate pedagogical concern). The grounds for school board curriculum decisions need only bear a reasonable relationship to their legitimate purpose. *Id.* The School Board has established, through literature on the MPAA, that relying on the ratings is a reasonable

---

2. The chilling effect of such in-school censorship is not alleviated even if students have access to the censored materials outside of the school. *See Pratt v. Indep. Sch. Dist.,* 670 F.2d 771, 779 (8th Cir.1982).

3. Borger has not claimed that the decision was based upon disapproval of the ideas presented in

the movie. In fact, the ideas were taught in various other ways throughout the school year.

4. In this case, no one has argued that "Schindler's List" is unprotected or even less protected speech because it contains nudity and violence or is "R" rated.

way of determining which movies are more likely to contain harsh language, nudity, and inappropriate material for high school students. Borger has not presented any evidence to counter this evidence. The School Board has also presented unrebutted evidence that as the ratings change, the policy gets amended or at least reconsidered. Movies with lesser ratings than "R" are dealt with on a case-by-case basis. However, "R" ratings are the threshold which the School Board has chosen as movies that will not even be considered. An R-rating indicates that reasonable people could determine that high school students should not view the film. *See Krizek*, 713 F.Supp. at 1139. That "reasonableness" is all that is necessary in a high school setting. This is a constitutional exercise of school board discretion, and the court shall not enjoin the enforcement of policy 6161.11.

**IT IS THEREFORE ORDERED** that Benjamin Borger's motions for summary judgment, preliminary injunction, and class certification are DENIED.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment is GRANTED, and this case is DISMISSED.